896 F.2d 548
 1990 A.M.C. 2515
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
W.R. GRACE & COMPANY, Plaintiff-Appellee,
v.
S.C. LOVELAND CO., INC.; Quaker Tugs, Inc., in personam,
Defendants-Appellants,
and
TUG GENERAL LEE, her engines, boilers, etc., in rem, Defendant,
v.
ALLIED CHEMICAL INTERNATIONAL CORPORATION, Third Party Defendant.
W.R. GRACE & COMPANY, Plaintiff-Appellant,
v.
S.C. LOVELAND CO., INC.; Quaker Tugs, Inc., in personam;
Tug General Lee, her engines, boilers, etc., in
rem, Defendants-Appellees,
v.
ALLIED CHEMICAL INTERNATIONAL CORPORATION, Third Party Defendant.
 Nos. 88-1311, 88-1318.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 11, 1989.
Decided: Jan. 31, 1990.
 
 Edward V. Cattell, Jr. (Clark, Ladner, Fortenbaugh & Young; Robert M. Hughes, III, Hunton & Williams, on brief), for appellant.
 Guilford D. Ware (Joan E. Mahoney, Crenshaw & Ware; Richard W. Stone, II, Waesche, Sheinbaum & O'Regan, on brief); Waverly Lee Berkley, III (R. Arthur Jett, Jr., Jett, Berkley, Furr & Bouffard, on brief), for appellees.
 Before MURNAGHAN and WILKINSON, Circuit Judges, and HAYNSWORTH,* Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 The large, unmanned barge Loveland 3402 under tow by the Tug General Lee put to sea on a voyage from Norfolk, Virginia, to Puerto Rico. On a previous voyage a serious problem of flooding of the bow rake tank had been encountered. Repairs were effected that proved inadequate on an ocean voyage in wintery seas. The barge again took on water in the bow rake tank and, apparently, in the port wing tanks. She was down in the bow and listing to port before she finally capsized and ultimately sank taking with her her cargo of ammonium sulfate owned by Grace.
 
 
 2
 In consequence of the sinking, W.R. Grace & Company brought this suit in admiralty against S.C. Loveland Co., Inc., owner of the barge, Quaker Tugs, Inc., the owner of the tug, and against the tug in rem.
 
 
 3
 Loveland did not deny its liability, but sought reformation of the charter party to include a limitation of its liability to $25,000 per shipment.
 
 
 4
 The district court awarded Grace the full value of the cargo, but declined to award prejudgment interest or to award judgment in rem against the tug. These cross appeals followed.
 
 
 5
 We affirm the award of full damages to Grace, but remand with directions to award prejudgment interest and to grant a judgment in rem against the tug.
 
 I.
 
 6
 On the previous voyage of the barge, there had been serious breaches of her watertight integrity. She had taken on a cargo of coal at Newport News, Virginia, for transportation to Portland, Maine. As she proceeded under tow of the General Lee, she was seen to be down at the bow. She was ordered into port at New York where a temporary repair of a crack in the bottom of the bow rake tank was effected. She was ordered to proceed through the relatively protected waters of the inner route through Long Island Sound and the Cape Cod Canal. Upon arrival at Portland, she was so far down in the bow that her forward deck was under water instead of having several feet of free board. There, it was found that the bow rake tank and the No. 1 port wing tank were completely full of water. The forward cargo hold was half full of water, and there was water in both the No. 1 and No. 2 inner bottom tanks.
 
 
 7
 Further repairs were attempted in Philadelphia at Loveland's home port facilities, but without dry-docking for access to the bottom plates from outside.
 
 
 8
 She was then dispatched to Hopewell, Virginia, to pick up a cargo of ammonium sulfate.
 
 
 9
 At Hopewell, it was found that there was water in the No. 2 inner bottom tank of the barge and that there was a hole in the bottom. A temporary pump was rigged.
 
 
 10
 While in Hopewell to take on her cargo representatives of the American Bureau of Shipping came aboard for an annual hull survey and load line inspection. Neither the Coast Guard nor the Bureau had been informed of the serious flooding problems that had been encountered during the preceding voyage, and the inspecting representatives were not told of the then unrepaired hole in the No. 2 inner bottom tank. They made a walk around inspection of the barge and found two cracked plates at the stern near the deck line. They required that those plates be repaired at Norfolk before the flotilla sailed for Puerto Rico, but, uninformed that any flooding problems had been encountered in any of the void spaces, the inspectors did not enter those spaces.
 
 
 11
 At Norfolk the cracked plates at the stern were repaired as was the hole in the No. 2 inner bottom tank.
 
 
 12
 She was overloaded at Hopewell, so 471 short tons of ammonium sulfate were discharged at Norfolk, leaving 9,371 short tons, of which 3,800 tons were to be discharged in San Juan, Puerto Rico and the remaining 5,571 tons were to be discharged at Guanica, Puerto Rico.
 
 
 13
 The tug, with the barge in tow, then departed for Puerto Rico.
 
 
 14
 It was February, and the wind and seas encountered were no worse than those to be expected during the winter. There was a recurrence of the flooding of the forward void spaces. The barge was seen to be again down by the bow. The barge capsized in the early morning hours of February 10, 1987, less than five full days after having left Norfolk. The flotilla turned back with the barge in an inverted position, but the towing cable was released on the 13th and the barge sank on the 18th.
 
 II.
 
 15
 In an attempt to obtain reformation of the charter party, Loveland introduced evidence, that, acting through brokers in February 1983, it entered into a charter party with Aruba Chemical Industries, a subsidiary of W.R. Grace, for the transportation of a cargo of ammonium sulfate from Hopewell, Virginia, to Puerto Rico. There had been a "fixture" of the terms of the agreement by a communication from Loveland's brokers to Aruba's broker. The fixture provided a limitation of liability of $500 per package or $25,000 per shipment. When the formal charter party was prepared, however, there was no $25,000 per shipment limit on Loveland's liability.
 
 
 16
 Loveland theorizes that the omission was simply a typist's mistake.
 
 
 17
 Loveland proceeds to theorize that the omission of the 1983 charter party with Aruba was inadvertently carried forward into successive charter parties between Loveland and Allied Chemical for performance of substantially the same carriage service. The fixture for the January 1987 charter party under which the February 1987 voyage was undertaken did provide the boilerplate terms would be those in the preceding charter party between Loveland and Allied.
 
 
 18
 It is true that Allied may have been acting, in a sense, as agent for W.R. Grace, for, under the terms of the sale of the ammonium sulfate by Allied to Grace, title to the goods would pass from Allied to Grace when the chemical was loaded on board the barge for carriage to Puerto Rico. Everyone agrees that when the voyage was undertaken Grace, rather than Allied, was the owner of the cargo.
 
 
 19
 If the question had been brought up in January 1987, it may be that a limitation of $25,000 per shipment to Loveland's liability would have been acceptable to Allied and to Grace, although any conclusion to that effect would be entirely speculative. There was no reference in the 1987 charter party to the 1983 charter party with Aruba much less to the fixture of that earlier charter party. There was no showing that the negotiators for Allied in 1987 knew anything about the fixture of the 1983 charter party with Aruba. There was a similar lack of evidence of a reference in an earlier charter party with Allied Chemical to the fixture for the 1983 charter party with Aruba.
 
 
 20
 The district court dismissed the claim for reformation of the charter party as frivolous. It may be not quite that lacking in merit, but the district court was quite correct in concluding that Loveland had failed to show that the January 1987 charter party did not reflect the true intention of Allied and its negotiators. Loveland's officials testified to that intention on their part, but there was no such testimony about Allied's intention. There was thus a failure to show the kind of mutual mistake that would warrant contract reformation.
 
 
 21
 Since there were two different ports of discharge, two different bills of lading were issued each covering that part of the cargo to be discharged at one of the ports. Each of the bills of lading incorporated by reference the charter party between Loveland and Allied. The terms of that charter party thus became binding upon Grace when Grace became owner of the cargo.
 
 
 22
 There is nothing to suggest, however, that Grace's actual intention was not that expressed in the written charter party.
 
 III.
 
 23
 The 1987 charter party did contain a paragraph upon the basis of which Loveland makes a secondary contention. It contends that its liability should be limited to the $235,446.66, freight paid for the transportation of the ammonium sulfate to Puerto Rico.
 
 
 24
 Paragraph 33 of the charter party provided:
 
 
 25
 INDEMNITY 33. Indemnity for non[-]performance of this Charter Party shall be proved damages, not exceeding estimated amount of freight.
 
 
 26
 We agree with the district judge that that provision is inapplicable. It was designed to cover a situation in which Loveland was unable or unwilling to undertake the mission. If it was unable to provide a tug and barge to perform the transportation, Loveland should not retain the freight collected for its transportation service and a limitation of its liability to the estimated amount of the freight charges may be entirely reasonable. When a cargo is lost or damaged, however, the value of the shipments lost has no rational relation to the amount of the freight charges. The value of this cargo, Grace's actual loss, was $644,740.84. Grace suffered a loss in that amount by reason of the negligence of Loveland, a casualty far different in kind and in effect from simple non-performance by Loveland of its agreed carriage.
 
 IV.
 
 27
 Although the district court gave short shrift to the only contentions seriously advanced by Loveland, it declined to award prejudgment interest to Grace. It explained its declination because of "the myriad of points of controversy."
 
 
 28
 In admiralty prejudgment interest is awarded as compensation for the loss of use of money. Its award is not dependent upon a finding that there was an absence of reasonableness or sincerity in the defendant's resistance of the claim. Its award is almost automatic unless the manner in which the claim has been prosecuted is properly subject to criticism. See also Federal Ins. Co. v. Sabine Towing & Transp. Co., 783 F.2d 347, 352 n. 4 (2d Cir.1986); Matter of Bankers Trust Co., 658 F.2d 103, 109 (3d Cir.1981); cert. denied, 456 U.S. 961 (1982); see generally 34 A.L.R.Fed. 126 (1977 & Supp.1988).
 
 
 29
 In this circuit we have emphasized the discretion of the district court in deciding whether to award prejudgment interest. E.g., Bubla v. Bradshaw, 795 F.2d 349, 355 (4th Cir.1986); Salter Marine, Inc. v. Conti Carriers & Terminals, Inc., 677 F.2d 388, 391 (4th Cir.1982); Ameejee Valleejee and Sons v. M/V Victoria U., 661 F.2d 310, 313-14 (4th Cir.1981). That is not to say, however, that an award of prejudgment interest may be refused simply because the case is complex. That is especially true if the case is no more complex than the run of admiralty cases and if the claimant itself has not unnecessarily added to its complexity.
 
 
 30
 The district court suggested no basis of criticism of Grace or of Grace's prosecution of this claim. Its denial of prejudgment interest is premised alone upon the basis of the fact that the case involved some, but no extraordinary, complexity.
 
 
 31
 That was an insufficient reason for a denial of an award of prejudgment interest.
 
 V.
 
 32
 Finally, Grace appeals the denial of a judgment in rem against the tug.
 
 
 33
 Captain Coram, the captain of the tug, was the "person in charge" of the unmanned barge while under two by the tug under the provision of 46 C.F.R. Sec. 97.07(a)(3). That section provides:
 
 
 34
 The owner, agent, master or person in charge of a vessel involved in a marine casualty shall give notice as soon as possible to the nearest Coast Guard Marine Safety or Marine Inspection whenever the casualty involves any of the following:
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 (c) An occurrence materially and adversely affecting the vessel's seaworthiness or fitness for service or route, including but not limited to fire, flooding, or failure or damage to fixed fire extinguishing systems, lifesaving equipment, auxiliary power generating equipment, or bilge pumping systems....
 
 
 38
 On the previous voyage there had been flooding of several watertight compartments. Captain Coram dutifully kept Loveland, owner of the barge, informed of its misadventures. While at Hopewell to take on the cargo of ammonium sulfate and the discovery of a hole in the bottom of the No. 2 inner bottom tank, Captain Coram again reported the matter to Loveland, but he never reported any of these things to the Coast Guard or to the American Bureau of Shipping. Even when representatives of the American Bureau of Shipping came aboard for an inspection, Captain Coram did not inform them of any of the violations of the watertight integrity of the barge. He did not even mention the existing hole in the bottom of the inner bottom tank, and the inspectors did not enter any of the supposedly watertight spaces. Captain Coram informed Loveland, as he should have done, but he did nothing to satisfy his legal duty as the person in charge of the barge to inform the Coast Guard of the flooding of the barge's void spaces which substantially questioned the seaworthiness of the barge. The captain cannot exonerate himself by claiming that Loveland should have performed the legal requirement made primarily upon the captain of the tug. Had Loveland informed the Coast Guard, one might say that Captain Coram indirectly performed what was required of him, but he cannot claim performance of the duty when no one informed the Coast Guard of the misadventures experienced by the barge.
 
 
 39
 The non-performance of the captain of the tug of his duty was negligence for which the tug is liable in rem.
 
 VI.
 
 40
 Grace invites us to make an award to it of attorneys' fees and double costs under F.R.A.P. 38. We decline to do so. We have rejected Loveland's appeal on its merits, but the district court's refusal to award prejudgment interest strongly influences us not to impose a sanction for having brought an entirely frivolous appeal.
 
 VII.
 
 41
 For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part and remanded.
 
 
 42
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 
 *
 Judge Haynsworth participated in the consideration of this case but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. Sec. 46(d)